**THE ROSEN LAW FIRM, P.A.**
Joshua Baker, Esq. (BBO #695561)
Jonathan Stern, Esq. (*pro hac vice pending*)
Laurence M. Rosen, Esq. (*pro hac vice* to be submitted)
Phillip Kim, Esq. (*pro hac vice* to be submitted)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com
Email: jstern@rosenlegal.com
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NOPPHOL BUATHONGSRI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ZENAS BIOPHARMA, INC. LEON O. MOULDER, JR., JENNIFER FOX, PATRICIA ALLEN, JAMES BOYLAN, PATRICK ENRIGHT, TOMAS KISELAK, HONGBO LU, PH.D, JAKE NUNN, JOHN ORLOFF, M.D., TING XIAO, MORGAN STANLEY & CO. LLC, JEFFERIES LLC, CITIGROUP GLOBAL MARKETS, INC., GUGGENHEIM SECURITIES, LLC, <br><br> Defendants. | **CASE No.: 1:25-cv-10988** <br> **Hon. Leo T. Sorokin** <br><br><br> **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** <br><br> **ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND............................................................................................ 2

    A.  THE IMPORTANCE OF "BURN RATE" TO DEVELOPMENT STAGE
    BIOTECHNOLOGY COMPANIES ..........................................................................2

    B.  COMPANY BACKGROUND .....................................................................................3

    C.  DEFENDANTS VIOLATED THEIR AFFIRMATIVE OBLIGATION TO
    DISCLOSE MATERIAL RISKS AND UNCERTAINTIES UNDER SEC
    REGULATIONS .........................................................................................................5

III.  ARGUMENT ................................................................................................................... 7

    A.  Lead Plaintiff Faces a Minimal Pleading Burden Under Section 11 .......................7

    B.  Defendants' Disclosures violated Item 303 ..............................................................8

    C.  Defendants' R&D Disclosures were Materially Misleading for Failing to
    Disclose the Rapid Increase in Spending on Obexelimab Between the First and
    Second Quarter of 2024 ...........................................................................................11

        1.  The Statements Were Misleading ............................................................... 11

        2.  The Omitted Burn Rate was Material ......................................................... 14

    D.  The Complaint Alleges a Control Person Violation. .............................................17

IV.  CONCLUSION............................................................................................................... 17

V.  CERTIFICATE OF SERVICE ...................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angelos v. Tokai Pharms., Inc.*,
  494 F. Supp. 3d 39 (D. Mass. 2020) .................................................................................... 13

*Asay v. Pinduoduo Inc.*,
  No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ...................................................... 16

*Ashcroft v. Iqbal*,
  556 US 662, 129 S Ct 1937, 173 L Ed 2d 868 (2009) ............................................................ 7

*Basic Inc. v. Levinson*,
  485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ........................................................... 14

*Batson v. Rim San Antonio Acquisition, LCC*,
  No. 15-CV-07576 (ALC), 2016 WL 6901312 (S.D.N.Y. Nov. 22, 2016) .............................. 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 7

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) .................................................................................................. 14

*In re Biogen Inc. Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016) ....................................................................................... 15

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) .................................................................................................... 14

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
  705 F. Supp. 2d 86 (D. Mass. 2010) ....................................................................................... 8

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013) .................................................................................................... 15

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) ....................................................................................... 10

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011) .................................................................................................... 8

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
  36 F.3d 170 (1st Cir.1994) .................................................................................................... 12

*Peifa Xu v. Gridsum Holding Inc.*,
  No. 18 CIV. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) ................................. 16

*Pension Tr. v. J.Jill, Inc.*,
  360 F. Supp. 3d 17 (D. Mass. 2018) ........................................................................ 13

*Plumbers' Union Loc. No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  894 F. Supp. 2d 144 (D. Mass. 2012) ....................................................................... 8

*Sec. & Exch. Comm'n v. Wilcox*,
  663 F. Supp. 3d 146 (D. Mass. 2023) ...................................................................... 15

*Shaw v. Dig. Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996) ............................................................................... 7, 10

*Silverstrand Invs. v AMAG Pharms., Inc.*,
  707 F.3d 95 (1st Cir. 2013) .............................................................................. 7, 8, 9

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
  412 F. Supp. 3d 353 (S.D.N.Y. 2019) ..................................................................... 11

**Statutes**

15 U.S.C. § 77k ............................................................................................................ 7

15 U.S.C. § 77k(a) ...................................................................................................... 13

**Rules**

Fed. R. Civ. P. 8(a) ...................................................................................................... 7

**Regulations**

17 C.F.R. §229.105 ...................................................................................................... 5

17 C.F.R. §229.303(b)(1)(i) ......................................................................................... 8

17 C.F.R. § 229.303 ................................................................................................. 5, 6

17 C.F.R. § 229.501(b)(10) ........................................................................................ 14

17 C.F.R. § 230.412(c) ............................................................................................... 14

**Other Authorities**

Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv.
  Co. Disclosures, Release No. 6835 (May 18, 1989) .................................................. 6

## I.    INTRODUCTION

This is a straightforward Securities Act case. Zenas went public in September 2024 as a pre-revenue, clinical-stage biopharmaceutical company whose value depended on a simple question: how quickly it was burning cash to advance obexelimab through four ongoing clinical programs. In the Registration Statement, Zenas told investors it would use approximately $100.0 million of the IPO proceeds to advance obexelimab's clinical development, but it disclosed only aggregate first-half 2024 R&D and cash-flow figures. These disclosures, however, omitted that the then-existing reality that its R&D spending had jumped from $22.645 million in the first quarter of 2024 to $33.807 million in the second quarter—an increase of roughly 49%—and remained at essentially that elevated level in the third quarter already underway. For a company with no revenue, this was crucial information. Zenas's burn rate at the time of the IPO, which Zenas concealed, was a core measure of runway, execution risk, and valuation.

Defendants try to recast this case as a complaint about failing to disclose quarterly data in the abstract. It is not. The question is whether Defendants could present half-year totals and generic warnings that expenses and losses might increase, while omitting the concrete, known fact that Zenas's cash burn had already stepped up materially in the last completed quarter and remained elevated at the time of the offering. As Plaintiff explains, disclosures about past increases or future expectations do not substitute for disclosure of a present trend in the effective Registration Statement, particularly where investors were being asked to evaluate whether the proceeds of the IPO would be sufficient to fund the clinical program Zenas said those proceeds would support.

That omission is actionable for two independent reasons. First, it rendered the Registration Statement misleading by presenting an incomplete picture of Zenas's financial condition at the moment investors were asked to buy into the IPO. Second, Item 303 required disclosure of known trends and uncertainties reasonably likely to affect liquidity, capital resources, and results of

1

operations. At minimum, whether this omitted burn-rate escalation would have significantly altered the total mix of information available to a reasonable investor is a fact-bound question not suited for resolution on a motion to dismiss. The motion should therefore be denied.

## II.    FACTUAL BACKGROUND

### A.    THE IMPORTANCE OF "BURN RATE" TO DEVELOPMENT STAGE BIOTECHNOLOGY COMPANIES

For development-stage biotechnology companies that have little or no product revenue, the company's burn rate, the pace at which the company expends cash, is one of the most important financial metrics investors rely upon to evaluate the company's prospects and valuation. The Biotechnology Innovation Organization ("BIO"), the leading trade association representing the biotechnology industry, explained to the SEC that investors in such companies "use … valuation metrics, such as burn rate," and that "the burn rate … is one of the most important valuation metrics for biotech companies." *Letter from BIO to the SEC, File No. S7-06-19: Amendments to the Accelerated Filer and Large Accelerated Filer Definitions* (July 29 2019), at 3, *available at* https://www.sec.gov/comments/s7-06-19/s70619-5881309-188765.pdf. In a subsequent submission to the SEC, BIO reiterated that "[t]his spectrum of cash levels and burn rates is part of the fundamental analysis of the industry, which is calculated by most biotechnology specialist investors and analysts." *Letter from BIO to the SEC, File No. S7-10-22: The Enhancement and Standardization of Climate-Related Disclosures for Investors* (June 17 2022), at 6, *available at* https://www.sec.gov/comments/s7-10-22/s71022-20132154-302645.pdf. Accordingly, burn rate is a crucial indicator of viability in the eyes of investors, and accurate disclosure of these metrics - and of any trends or uncertainties affecting them - is critically important to investors in early-

stage biotechnology issuers. Therefore, it is highly material to investors if the burn rate of a company such as Zenas was materially increasing during the lead up to the IPO.[1]

### B.    COMPANY BACKGROUND

Zenas is a clinical-stage biopharmaceutical company developing immunology-based therapies for patients with autoimmune diseases. ¶38[2]. Its lead product candidate, obexelimab, is a monoclonal antibody. Zenas is developing obexelimab as a potential treatment for several autoimmune diseases. *Id.* At the time of the IPO, Zenas was pursuing clinical trials for the following four conditions: (i) immunoglobulin G4-related disease ("IgG4-RD") - Phase 3 trial; (ii) multiple sclerosis ("MS") – Phase 2 trial; (iii) systemic lupus erythematosus ("SLE") Phase 2 trial; and (iv) warm autoimmune hemolytic anemia ("wAIHA")  - ongoing Phase 2/3 trial, then  in the Phase 2 open label portion. *Id.*

The following represents Zenas's development pipeline as depicted in its Registration Statement.

| PROGRAM | INDICATION | PHASE 1 | PHASE 2 | PHASE 3 |
|---|---|---|---|---|
| Obexelimab[1,2]<br>CD19xFcγRIIb<br>bifunctional mAb | IgG4-RD<br>(immunoglobulin<br>G4-Related Disease) | Phase 3 INDIGO trial enrolling[3] | | |
| | MS<br>(Multiple Sclerosis) | Phase 2 MoonStone trial enrolling[3] | | |
| | SLE<br>(Systemic Lupus<br>Erythematosus) | Phase 2 SunStone trial initiated[3] | | |
| | wAIHA<br>(warm Autoimmune<br>Hemolytic Anemia) | Phase 2 SApHiAre trial enrolling | | |

[1] Zenas acquired exclusive worldwide rights to obexelimab from Xencor, Inc.
[2] Bristol Myers Squibb & Co. holds exclusive development and commercialization rights in JPN, SK, TWN, HK, SGP, AUS
[3] Randomized versus placebo

¶39.

---

[1] Defendants argue that the BIO explained the importance of burn rate, but not the importance of *quarterly* burn rate. But this misses the point. The issue is not merely that Defendants did not disclose quarterly information in the aggregate, it is that Defendants failed to disclose a drastic increase in the burn rate.

[2] Unless otherwise specified, references to ¶_ refer to the Amended Complaint (Dkt. No. 22).

Zenas represented in its Registration Statement that it intended to use the proceeds from the IPO as follows: (i) approximately $100.0 million to advance the clinical development of obexelimab, including to complete the Phase 3 trial for patients with IgG4-RD, the Phase 2 trial for patients with MS, the Phase 2 trial for patients with SLE, and the Phase 2 portion of the trial for patients with wAIHA and (ii) the remainder to prepare for the obexelimab commercial launch in the U.S. and Europe, if approved, including for the manufacture of commercial supply, and for working capital and other general corporate purposes. ¶40.

Zenas stated that it had spent $56,452,000 in the first six months of 2024 on Research and Development, and had total operating expenses of $67,280,000. ¶41. Of its research and development expenses, $35,082,000 went to development of obexelimab. *Id.*

What Zenas failed to disclose, however, was that its spending was not uniform across the first six months of 2024. Instead, Zenas' R & D expenses dramatically increased from the first to the second quarter of 2024, from $22,645,000 in the first quarter, to $33,807,000 in the second quarter, an increase of 49% quarter over quarter. ¶42. The trend continued into the third quarter already in progress, with Zenas spending $33,530,000 that quarter. This increase was driven in large part by increased spending on obexelimab research, which increased from $12,295,000 in the first quarter to $22,788,000 in the second quarter and remaining at the high rate of $21,326,000 in the third quarter. *Id.* The below table represents Zenas' R & D spending overall and on developing obexelimab for each quarter of 2024 as well as its cash flows from operations:

|  | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| Overall R&D | $22,645,000 | $33,807,000 | $33,530,000 | $49,157,000 |
| Obexelimab R&D | $12,295,000 | $22,788,000 | $21,326,000 | $38,154,000 |
| Cash Flows from Operations | -$19,102,000 | -$30,959,000 | -$31,059,000 | -$38,554,000 |

*Id.*

By failing to separately disclose its first and second quarter expenses and cash burn rate, Defendants materially misled investors into believing that Zenas was spending less quickly than it actually was, which was highly material to investors given the fact that Zenas was a development stage biotechnology company with no revenues. ¶43.

### C.    DEFENDANTS VIOLATED THEIR AFFIRMATIVE OBLIGATION TO DISCLOSE MATERIAL RISKS AND UNCERTAINTIES UNDER SEC REGULATIONS

Registrants are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id.* Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id.*

Reg. S-K, Item 303, also requires a registrant to discusses in the "Management's Discussion and Analysis of financial condition and results of operations" material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. 17 C.F.R. § 229.303. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. *Id.* This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. *Id.* The discussion and analysis must be of the financial statements and other statistical data that the registrant believes

5

will enhance a reader's understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations. *Id.* A discussion and analysis that meets the requirements of this paragraph is expected to better allow investors to view the registrant from management's perspective. *Id.*

In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.

Item 303 creates a duty to disclose a known trend, event or uncertainty unless management determines that a material effect on financial condition or results of operations is not likely to appear.

Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6.

Defendants knew that the Company's R&D expenses had materially increased between the first and second quarters of 2024, and remained higher in the quarter in progress. In the context of Defendants' affirmative disclosures about its revenues, Defendants failed to disclose the trend and its impact on the Company's finances.

6

## III.   ARGUMENT

On a Rule 12(b)(6) motion, the Court accepts as true all well-pled factual allegations and evaluates whether the supporting factual allegations make each claim "plausible on its face." See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Section 11 of the Securities Act imposes strict liability on issuers and an underwriter may be held liable for mere negligence. See *Silverstrand Invs. v AMAG Pharms., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013). A claim under the Securities Act is required to show only that "any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. A claim that arises under the Securities Act does not require a plaintiff to plead scienter or reliance. *AMAG Pharms., Inc.*, 707 F.3d at 102. Instead, to assert a Section 11 claim, a plaintiff is required to meet only a "relatively minimal burden" under Rule 8(a) of the Federal Rules of Civil Procedure. *Id.*

In addition, Item 303 and 105 of SEC Regulation S-K impose additional obligations on issuers of securities to disclose certain known uncertainties and risks associated with the business that would allow investors "to look at the company through the eyes of management." *Id.*

### A.   Lead Plaintiff Faces a Minimal Pleading Burden Under Section 11

The First Circuit has long held that a Section 11 claim does not trigger Rule 9(b) unless allegations of scienter and reliance are incorporated in the Securities Act claims. See *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996). Defendants do not contend that Rule 9(b)'s heightened pleading standards apply.

"Section 11 imposes liability on the issuer of a security, as well as any person who signed the registration statement and/or served as a director or performed similar functions, if the

7

registration statement 1) contained an untrue statement of material fact, 2) omitted to state a material fact or 3) omitted a material fact necessary to make the statements therein not misleading." *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 91 (D. Mass. 2010) Contrary to Defendants' motion, Complaints under Section 11 of the Securities Act need not allege loss causation. "Loss causation is not … an element of a prima facie case under Sections 11 and 12 and, accordingly, the plaintiffs are under no obligation to plead it." *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 94 (D. Mass. 2010); *see also Plumbers' Union Loc. No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 894 F. Supp. 2d 144, 151 (D. Mass. 2012) ("[T]he absence of loss causation (sometimes termed 'negative loss causation') is an affirmative defense.").

### B.     Defendants' Disclosures violated Item 303

Item 303 requires that a registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(1)(i). "The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir. 2011).

The First Circuit in *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.* established that "[t]o plausibly plead such a failure to disclose claim, a complaint must allege (1) that a registrant knew about an uncertainty before an offering; (2) that the known uncertainty is 'reasonably likely to have material effects on the registrant's financial condition or results of operation'; and (3) that the offering documents failed to disclose the known

8

uncertainty." *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.*, 707 F.3d 95, 103 (2013). The court emphasized that Item 303 imposes disclosure duties "intended to give the investor an opportunity to look at the company through the eyes of management" to assess the registrant's financial condition and results of operations, with particular emphasis on future prospects *Id.* at 102. The Complaint easily satisfies the *Silverstrand* test.

First, the trend was known. Given how crucial burn rate is to pre-revenue biotech start ups such as Zenas, it is implausible that management was unaware of its own burn rate. Indeed, as Defendants themselves acknowledge, the Company's confidential draft registration statements submitted to the SEC included quarter by quarter burn rate. Second, the increase in burn rate was highly material to investors.

Second, the trend was highly material to investors. Because Zenas was a pre-revenue, clinical-stage biotechnology company, its cash burn was a central indicator of its financial viability and investment value. The Company generated "essentially no revenues" while incurring tens of millions of dollars in R&D expenses and negative operating cash flows exceeding $50 million in just six months. ¶¶ 4–5. In that context, investors necessarily relied on the Company's rate of spending to assess how long its cash reserves—and the proceeds from the IPO—would sustain operations, and whether additional financing or dilution would be required. *Id.*

Industry authorities confirm the centrality of this metric. As the Biotechnology Innovation Organization ("BIO") explained to the SEC, investors "use … valuation metrics, such as burn rate," and "the burn rate … is one of the most important valuation metrics for biotech companies." ¶ 37. BIO further emphasized that "cash levels and burn rates" are part of the "fundamental analysis of the industry" performed by biotechnology investors and analysts. ¶ 37.

Consistent with that understanding, the Complaint alleges that Zenas's R&D expenses— and thus its burn rate—increased by approximately 50% quarter-over-quarter, a dramatic shift that

9

materially altered the Company's liquidity outlook and financial trajectory in real time. ¶ 5. This heightened burn rate persisted in the then-in-progress Q3. ¶ 42. Given that Zenas told investors it would use IPO proceeds to fund ongoing clinical trials and operations, the magnitude and acceleration of its burn rate went directly to whether those proceeds would be sufficient to execute the Company's stated business plan. ¶4. In these circumstances, accurate disclosure of burn rate trends was highly material to investors. ¶37.

Finally, the trend was unknown to investors. While investors knew that the Company's burn rate had increased from the prior year, they were unaware of the subsequent increase between the first and the second quarter, or that it was persisting in the third quarter.

Defendants argue that Zenas' expenses increasing for Q2 followed by a decrease in Q3 cannot constitute a trend is a matter of law. This is wrong on both the law and the facts. It is wrong on the law because, in the First Circuit, even a shift in operating results that occurs *intra-quarter* can create a reporting obligation. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1211 (1st Cir. 1996). Therefore, it follows that full quarter results can create a reporting obligation under Item 303. Moreover, Defendants' assertion that the trend only lasted a quarter is itself at odds with the facts. Defendants make much of the fact that R&D declined between the second and then in progress third quarter. But the decline on which Defendants' motion hinges was a mere $277,000 between Q2 and Q3, or .8% of Q2 expenses. ¶42. Therefore, contrary to Defendants' premise that the increase in spending was transient and limited to a single quarter, the reality is that the heightened level of spending represented Zenas' new normal, a highly material fact that Defendants concealed from investors. The case law on which Defendants rely is easily distinguishable. *Turkcell* found first that the decline in operating income was too small, and relied on "the reluctance of courts to require companies to release results before, or within days of, the end of fiscal quarters". *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001). *Skechers,* to

10

the extent that it finds a single quarter change in a financial metric insufficient is at odds with *Shaw*, and is irrelevant in any event because the heightened spending present in Q2 persisted into Q3. *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

Next, Defendants argue that their disclosure of the earlier increase in expenses between 2023 and 2024 immunize them from their failure to disclose that expenses had continued to rapidly increase between the first and second quarter of 2024, and remained at the higher rate during the in-progress Q3. Defendants mischaracterize the omission. The Complaint does not allege merely that Zenas failed to disclose that R&D was "up." It alleges that Zenas omitted the specific, contemporaneous fact that its quarterly burn rate had sharply accelerated from Q1 to Q2 2024 and remained elevated in the in-progress Q3 at the time of the IPO. The half-year and year-over-year figures Defendants cite do not disclose that fact. For a pre-revenue biotech, current burn rate—not historical aggregate growth—is what matters to investors assessing liquidity, runway, and financing risk. Thus, unlike *Pinduododuo*, the omitted Q2/Q3 data here did not simply repeat a trend already revealed by the disclosed figures; it revealed a new, higher spending baseline in place when investors bought.

### C.    Defendants' R&D Disclosures were Materially Misleading for Failing to Disclose the Rapid Increase in Spending on Obexelimab Between the First and Second Quarter of 2024

#### 1.    The Statements Were Misleading

The registration alleges that Zenas' Registration Statement's Statement of Operations was misleading for failing to disclose that Zenas' "R&D expenses had materially increased between the first and second quarter of 2024, and remained at a higher rate during the already in progress third quarter". ¶¶ 55-56. The Registration Statement's Statement of Cash Flows was also

11

misleading for failing to disclose that Zenas' "cash burn had materially increased between the first and second quarter of 2024, and remained at a higher rate during the already in progress third quarter". ¶¶57-58. That the expense numbers themselves were literally accurate "does not preclude liability under federal securities laws." *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir.1994). "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* The omission here was not merely that Zenas had a temporary spike in spending. It was that, at the time of the IPO, Zenas had already moved to a sharply higher quarterly spending level that had persisted for more than a single quarter and that Defendants failed to disclose that present reality. The Registration Statement reported only aggregated six-month figures, even though Defendants knew that R&D expense had jumped from $22.645 million in Q1 2024 to $33.807 million in Q2 2024—an increase of roughly 49%—and remained at essentially that same elevated level in the in-progress third quarter. For a pre-revenue biotech whose valuation depends heavily on cash runway and burn rate, omitting that quarter-over-quarter acceleration concealed the most decision-useful fact: the pace at which Zenas was actually consuming cash when investors bought in the IPO.

That omission was materially misleading because aggregate half-year and year-over-year figures do not tell investors what the Company's current burn rate was. Investors in a clinical-stage biotech do not assess liquidity and dilution risk by looking only at backward-looking combined totals; they need to know whether spending has stepped up to a new baseline that will govern cash needs going forward. Here, the omitted information showed exactly that. While investors were aware of earlier increases in spending, nothing had put them on notice that the information provided in the Registration Statement was already stale, or that further spending increases had

12

already occurred beyond the ones Defendants had disclosed. Nor does Defendants' warning of future spending increases cure the misleading nature of their statements. Warning of future spending increases would, if anything, have given investors a false sense of security that they were aware of all prior spending increases as of the time of the IPO. They were not. Defendants' reliance on their claim that they would only spend $100 million in IPO proceeds on completing obexelimab's development does not support their claim. Rather it undercuts it. Given that, at the time of the IPO, Zenas was spending in excess of $21 million per quarter on obexelimab's development, they would have spent the $100 million by some time in Q3 of 2025. But according to the Registration Statement, its clinical trials would not be complete until the end of 2025 or sometime in 2026. Dkt No. 33-1, pp. 7-10. Therefore, had Defendants disclosed the true rate of spending on obexelimab R&D, it would have called into question the feasibility of Zenas' claim to be able to use $100 million in IPO proceeds to complete development of obexelimab. Nor is it reasonable to expect investors to infer from the fact that Zenas intended to begin two clinical trials at some unspecified point in Q3 that Zenas would materially increase spending in 2024. And the Securities Act does not require investors to make such leaps in logic to understand Zenas' true financial condition. This distinguishes this case from those cases relied upon by Defendants, where the registration statement disclosed the *precise* information that was allegedly withheld. *See Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 49 (D. Mass. 2020); *Pension Tr. v. J.Jill, Inc.*, 360 F. Supp. 3d 17, 28 (D. Mass. 2018).

Nor can Defendants defeat Plaintiff's Section 11 claim by pointing to quarter-specific figures that appeared only in a pre-effective draft submission. Section 11 asks whether the registration statement that became effective contained the challenged omission. 15 U.S.C. § 77k(a). A draft submission is not that operative filing: the SEC treats draft registration statements as nonpublic submissions that are not filings, need not be signed, and may omit financial

information the issuer reasonably believes will not be required when the registration statement is publicly filed. *See* SEC, *Jumpstart Our Business Startups Act Frequently Asked Questions*; SEC, *Voluntary Submission of Draft Registration Statements—FAQs*. Rule 412(c) reinforces the point by providing that a superseded statement is not deemed part of the registration statement or prospectus for purposes of the Securities Act. 17 C.F.R. § 230.412(c). And the numbers in the draft were expressly provisional: Regulation S-K requires a "subject to completion" legend stating that the information is not complete and may be changed; Zenas used that legend in its preliminary prospectus, identified itself as an emerging growth company, and further warned that the information in the prospectus was accurate only as of the front-cover date and that its business, financial condition, results of operations, and prospects may have changed since that date. 17 C.F.R. § 229.501(b)(10); Dkt. No. 34-3. On these facts, a reasonable investor had no basis to treat quarter-specific figures in a superseded, subject-to-completion draft as final or operative disclosure, and Defendants cannot use a prior draft to cure an omission in the effective Registration Statement or to expand the operative total mix by forcing investors to compare multiple prospectus versions. *See DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) (noting that an investor cannot be expected to compare a printed and EDGAR version of a prospectus to determine its accuracy).

### 2.    The Omitted Burn Rate was Material

"A fact is material if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002) *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." Where courts do find statements immaterial at the motion to dismiss stage, it is typically where those statements are subjective and

14

vague expressions of corporate optimism, i.e., puffery. *See, e.g. In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016)*, aff'd*, 857 F.3d 34 (1st Cir. 2017), and aff'd, 857 F.3d 34 (1st Cir. 2017). That Zenas' burn rate increased between the first and second quarters by more than 50% and remained at that heightened rate through the in-progress third quarter was material. Courts routinely find that increases in important financial metrics such as these support materiality at the motion to dismiss stage. *Sec. & Exch. Comm'n v. Wilcox*, 663 F. Supp. 3d 146, 159 (D. Mass. 2023) (denying motion to dismiss where defendant "overstated its operating and net income in 2017 by 18% and 30%, respectively, and its operating and net income in 2018 by more than 80% and 200%"). Defendants, out of context, cite the out of circuit *ProShares* decision for the proposition that materiality is "a meaningful pleading obstacle", leaving out that the same opinion, in the same paragraph, noted that "materiality will rarely be dispositive in a motion to dismiss" and that the "alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that omission's unimportance." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013)

Defendants attempt to rebut materiality by alleging that they disclosed all material information. This argument fails. Their reliance on *Batson* is wholly misplaced because in that case, the literal fact alleged to be omitted, the expiration date of a property purchase offering, was specifically disclosed in the Offering Memorandum at issue in that case. *Batson v. Rim San Antonio Acquisition, LCC*, No. 15-CV-07576 (ALC), 2016 WL 6901312, at *6 (S.D.N.Y. Nov. 22, 2016). Instead, Defendants attempt to other information that was disclosed in the Registration Statement that they claim justifies their omission here. Specifically, Defendants argue that their disclosures of prior spending increases from 2023 to 2024, and their vague warning that spending would increase in the future, plus the disclosure that the majority of their R&D spending had come from obexelimab, constituted "all material information." But information about the past, or the future,

is no substitute for information of the present, and the fact that Defendants disclosed other material information does not somehow render their omission immaterial. This situation is nowhere close to analogous to *Gridsum*, where the court found that a complaint failed to explain why errors in certain line items were material because they were "a small part of the overall picture" of the company's finances. *Peifa Xu v. Gridsum Holding Inc.*, No. 18 CIV. 3655 (ER), 2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020). Here, by contrast, the omissions relate to the R&D spending of a company principally engaged in R&D, and the cash spending of a company with no revenues. These were not a small part of an overall picture, they were the overall picture.

The out-of-circuit *Pinduoduo* decision does nothing to change this analysis. First, as the District Court made more explicit in *Pinduoduo*, Pinduoduo's registration statement did not provide financial results for the first half of the fiscal year. Rather, its registration statement, issued less than a month after the close of the second quarter, included only financial results for the end of the first quarter. Second, the omitted information concerned Pinduoduo's customer acquisition costs, a metric that can fluctuate based on a variety of factors, and defendants' failure to disclose that in the second quarter, Pinduoduo increased marketing spend without finding a corresponding increase in customers. While this metric is in general important to investors, Pinduoduo provided detailed disclosures that increasing marketing costs might not result in the intended growth. *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021). Here, the situation is much more stark. Given Zenas' total lack of revenues, its ability to control R&D expenses were highly material to investors. This is particularly true where, as here, Zenas claimed that it would use "approximately $100.0 million [of the IPO proceeds] to advance the clinical development of obexelimab, including to complete the Phase 3 trial for patients with IgG4-RD, the Phase 2 trial for patients with MS, the Phase 2 trial for patients with SLE and the Phase 2 portion of the trial for patients with wAIHA" Dkt. No. 32-1, p. 79. Had investors known that, at

16

the time of the IPO, Zenas was spending almost $25 million per quarter to fulfill those tasks, it would have been apparent that Zenas would be unable to keep to the promised $100 million spend.

### D.    The Complaint Alleges a Control Person Violation.

Because the Complaint alleges a primary violation of Section 11, it also alleges a control person violation under Section 15.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss. If the Court grants the motion, any dismissal should be without prejudice.

**Dated: March 24, 2026**                    **Respectfully submitted,**

**THE ROSEN LAW FIRM, P.A.**

/s/ Joshua Baker
Joshua Baker, Esq. (BBO #695561)
Jonathan Stern, Esq. (*pro hac vice* pending)
Laurence M. Rosen, Esq. (*pro hac vice* to be submitted)
Phillip Kim, Esq. (*pro hac vice* to be submitted)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com
Email: jonathan.stern@gmail.com
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*
*and Class*

## V.      CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2026, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Joshua Baker

18